**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 31 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

FRANCES E. WILSON,

      Plaintiff-Appellee,

v.

TULSA JUNIOR COLLEGE, State of
Oklahoma (ex rel.) separately and
Kenneth Hall, in his capacity as
Supervisor; KENNETH HALL, in his
capacity as Tulsa Junior College
supervisor,

      Defendants-Appellants,

No. 96-5234

---

Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 95-CV-51-K)

---

Thomas L. Vogt of Jones, Givens, Gotcher & Bogan, P.C., Tulsa, Oklahoma, for
Defendants-Appellants.

Joe L. White of Collinsville, Oklahoma, for Plaintiff-Appellee.

---

Before **SEYMOUR**, Chief Judge, **EBEL** and **BRISCOE**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

Frances Wilson brought suit against Tulsa Junior College (TJC)[1] and Kenneth Hall in his capacity as a supervisor at TJC, asserting claims under Title VII for hostile work environment sexual harassment, quid pro quo sexual harassment, and retaliation. The jury returned a verdict against TJC on the hostile environment claim, awarding Ms. Wilson $100,000 in compensatory damages, and in favor of TJC on the quid pro quo and retaliation claims. The district court denied TJC's motion for judgment as a matter of law on the hostile environment claim. TJC appeals, and we affirm.

# I

On appeal, TJC contends the district court erred in denying its motion for judgment as a matter of law, asserting (1) that its formal policy against sexual harassment and Ms. Wilson's failure to utilize its reporting procedures shielded TJC from liability; and (2) that the evidence at trial was insufficient to support a finding that TJC knew or should have known of the harassment and failed to take appropriate remedial action.

We review de novo a district court's disposition of a motion for judgment as a matter of law, applying the same standard as the district court. Judgment as a

---

[1] TJC has since changed its name to Tulsa Community College. For the purpose of this appeal, we will continue to refer to the college as TJC.

matter of law is warranted "only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." Mason v. Oklahoma Turnpike Auth., 115 F.3d 1442, 1450 (10th Cir. 1997). "We do not weigh the evidence, pass on the credibility of the witnesses, or substitute our conclusions for that of the jury. However, we must enter judgment as a matter of law in favor of the moving party if 'there is no legally sufficient evidentiary basis . . . with respect to a claim or defense . . . under the controlling law.'" Harolds Stores, Inc. v. Dillard's Dep't Stores, 82 F.3d 1533, 1546-47 (10th Cir. 1996) (citation omitted) (quoting Fed. R. Civ. P. 50(a)). In conducting our review, "[t]he evidence and inferences therefrom must be construed most favorably to the nonmoving party." Wolfgang v. Mid-America Motorsports, Inc., 111 F.3d 1515, 1522 (10th Cir. 1997). The record viewed in this light reflects the following evidence.

TJC is a community college in Tulsa, Oklahoma, that offers day, weekend, and evening courses in general education and job skills training, and provides the first two years of an undergraduate degree. In the 1993-94 academic year, there were approximately 1500 employees and 30,000 students affiliated with the college. TJC operates the Metro, Northeast, and Southeast Campuses, which are in separate locations in the city of Tulsa. The President, Vice-President, and Director of Personnel are housed in the Administrative Offices, which are

removed from the campuses and located centrally in Tulsa.

The Administrative Offices are open during normal business hours. The only office on each campus that is open for twenty-four hours is the Campus Police Office. Under TJC's Policies, Practices, and Procedures Handbook for Full-Time Classified Staff for 1993-94 (the Handbook), TJC Campus Officers have "all power and authority vested by law and peace officers of the State of Oklahoma to arrest, bear arms, transport prisoners, make investigations, preserve the peace, and protect lives and property." Aplt. App. at 125. Among the primary objectives of the Campus Police are the protection of TJC's employees "from bodily harm or injury" and the rendering of "courteous information, service and assistance" to them. Id. at 126.

At the time the events at issue in this litigation occurred, TJC had a formal written sexual harassment policy in place, which was included in every new employee's orientation packet and redistributed annually in the Handbook. The sexual harassment policy for the 1993-94 school year provided that "sexual harassment of staff, faculty, students and visitors at any of the college's locations shall not be tolerated." Id. at 132. The policy included the following reporting procedure for victims of sexual harassment:

> In order to implement this policy in the spirit in which it is written, any staff person who feels he/she has been sexually offended should bring the incident to the attention of his/her supervisor. If the staff person is

-4-

> uncomfortable in bringing this to the attention of the supervisor, then it should be shared with the Director of Personnel Services. Student incidents should be reported to the Dean of Student Services.
>
> If further action is necessary, the staff member or student should file the complaint with the Director of Civil Rights (Vice President of Business and Auxiliary Services.) It is the responsibility of each supervisor within his/her area of control to report all formal complaints to the Director of Civil Rights.

Id. at 133.

In November 1992, TJC employed Ms. Wilson as a custodian for the Southeast Campus. Ms. Wilson was assigned to work the evening shift from 5:00 p.m. to 1:00 a.m. and was directly supervised by Kenneth Hall and Jerry Back. Mr. Hall held the title of Campus Lead Custodian at the Southeast Campus and was responsible for preparing the custodians' work assignments and generally supervising their work. Mr. Hall in turn reported to Ralph Macon, the Custodial Supervisor. Mr. Back worked under Mr. Hall to help him with his supervisory duties.

Ordinarily two custodians worked together to clean the classrooms on Southeast Campus. On the evening of February 15, 1994, however, Ms. Wilson was working alone because her partner had been suspended. Near midnight, Mr. Hall entered the classroom where Ms. Wilson was cleaning and exposed his penis to her. Ms. Wilson testified that Mr. Hall requested oral sex and told her she could have every Friday off with pay and no one would know because he handled

the payroll. Ms. Wilson further testified that Mr. Hall told her he could "make [her] life really good[ ] because he was [her] supervisor." Aplt. App. at 23. Mr. Hall threatened that he would return the next night for Ms. Wilson's answer and that if she refused him, "he could make [her] life hell." Id. Mr. Hall left the classroom, but returned shortly and followed Ms. Wilson for the rest of her shift, preventing her from reporting the incident to anyone.[2]

When her shift was over at 1 a.m., Ms. Wilson drove to her home in Broken Arrow where she immediately called 911 and contacted the Broken Arrow Police Department (BAPD). Ms. Wilson specifically requested to speak with Sergeant Mike Martin because she knew he worked part-time as a TJC Southeast Campus Officer. The operator informed her that Sgt. Martin worked during the day and was unavailable. Ms. Wilson asked for several other TJC Southeast Campus

---

[2] Ms. Wilson stated at trial that prior to the February 15 incident described above, Mr. Hall had stalked her and she had complained to Campus Officers about Mr. Hall's conduct. Apparently Ms. Wilson was not the only female custodian subject to Mr. Hall's amorous attentions. Jane Morrison testified that on the night of February 15 Mr. Hall also exposed his penis to her. She reported the incident to Mr. Back but only after Mr. Hall had been arrested for exposing himself to Ms. Wilson. Ms. Morrison further indicated that Mr. Hall had previously made sexual advances to her, but she had not complained to anyone of his conduct because she was afraid of what he might do to her. Debbie Graves, another female custodian who worked under Mr. Hall's supervision, testified that he left gifts for her at work, which made her nervous. Ms. Graves reported to Mr. Back one instance in which Mr. Hall had given her, and not any of the other female custodians, a gift of cigarettes. Ms. Graves testified that she returned the cigarettes to Mr. Hall and that she was unaware of any action taken by Mr. Back regarding this incident.

Officers who worked at the BAPD, but none of them were on duty. Ms. Wilson relayed the incidents of the evening to the operator, but since the BAPD did not have jurisdiction over crimes committed at TJC, the operator connected her directly to the Tulsa Police Department (TPD).

Ms. Wilson repeated the events of the evening to the Tulsa operator. At the instruction of the operator, Ms. Wilson's son drove her into Tulsa where Ms. Wilson met an officer from the TPD with whom she filed a complaint against Mr. Hall. The officer also contacted Officer Tracy Crocker, a female undercover agent with the TPD, and arranged for Ms. Wilson to meet with Officer Crocker on the evening of February 16 to fit her with a body microphone in anticipation of her confrontation with Mr. Hall for an answer to his demands of the previous night.

At 7:00 a.m. on the morning of February 16, Sgt. Martin contacted Herb Weber, the Campus Police Supervisor for the Southeast Campus, and advised him that an unidentified, "hysterical female" had called the BAPD claiming that her supervisor Kenneth Hall had exposed himself to her during her shift. Id. at 299. Mr. Weber took no action with regard to the information he received from Sgt. Martin until 3 p.m. that day, when he instructed Al Read, his Assistant Supervisor who worked the evening shift, to investigate the matter. Mr. Weber did not attempt to find out who the complaining custodial employee was, although he

admitted it would have been a relatively simple task. Aplt. App. at 299-300. Nor did Mr. Weber attempt to contact either the BAPD or TPD to gather more information about the complaint. Mr. Weber did not report the incident to his supervisor, Ben Horton, the Director of Security, or any other TJC administrator.

After the evening custodial shift reported for duty at 5:00 p.m., Mr. Read questioned Mr. Hall in his office about the incident, thereby alerting Mr. Hall to the fact that one of his female employees had contacted the BAPD about his conduct on the previous evening. Mr. Hall denied the allegations, and informed Mr. Read that he believed the phone call had been made by either Frances Wilson or Mary Foster in retaliation for recent reprimands he had given them about their absenteeism and work performance. Later that night, Mr. Hall told Mr. Read that he was "pretty sure the lady was Frances Wilson." Id. at 687. Mr. Hall, accompanied by Mr. Back, also provided Mr. Read with several examples of the allegedly provocative manner in which Ms. Wilson spoke and dressed on the job. Mr. Hall informed Mr. Read that both he and Mr. Back would gather together this information and return with "some notes . . . about previous actions of Frances Wilson" for the files. Id. At approximately 9:00 p.m., Mr. Hall returned to Mr. Read's office with the promised statements from himself and Mr. Back in addition

to copies of Ms. Wilson's attendance records.[3]  Mr. Read made no attempt to contact Ms. Wilson either to warn her that Mr. Hall was aware of her call to the BAPD, to check on her safety, or to hear her side of the story.

When Ms. Wilson arrived for work on the evening of February 16, she surmised from Mr. Hall's behavior towards her that he knew she had contacted the police.  Afraid of being left alone with Mr. Hall, Ms. Wilson asked TJC Southeast Campus Officer Gary Sanders to check in on her during the course of her shift, informing him about her encounter with Mr. Hall the previous evening and the undercover wire operation with the TPD that night.  Officer Sanders checked on Ms. Wilson as she requested, but did not report this conversation to Mr. Read until three hours later at approximately 10 p.m. as he was leaving his shift.  Mr. Read did not interfere with the operation, and no TJC employee informed Mr. Hall that Ms. Wilson would be wearing a wire.

In the meantime, Ms. Wilson left Southeast Campus at about 9 p.m. and met Officer Crocker at a convenience store where Officer Crocker equipped Ms. Wilson with a body microphone and transmitter.  At about 11 p.m., Mr. Hall confronted Ms. Wilson about the demands he made the night before and her phone

---

[3]Mr. Back's report contained assertions that Ms. Wilson acted flirtatiously, dressed provocatively, used vulgar language, and discussed affairs with men in public.  It also alleged that Ms. Morrison and Mr. Hall had told him of an incident in which Ms. Wilson made an offer of three-way sex to them.  In her testimony, however, Ms. Morrison denied she had heard Ms. Wilson make such an offer.

call to the BAPD reporting his conduct. Mr. Hall opened this taped conversation by defining sexual harassment as unwelcome sexual advances. He then repeatedly warned Ms. Wilson that he had witnesses, including Jane Morrison and several Campus Officers, who would testify that Ms. Wilson initiated offers of sex and that his advances were welcomed by her. He further advised Ms. Wilson that so long as he had witnesses to back up his version of the facts, the truth of her sexual harassment allegation was irrelevant. Mr. Hall instructed her not to file a complaint with either TJC or the police and to keep her mouth shut, threatening Ms. Wilson with, among other things, a poor recommendation to prevent her from getting a job in the future.

Shortly after midnight on February 17, Tulsa police officers arrested Mr. Hall. When he reported to work the next evening, TJC immediately suspended him. Approximately three weeks later, TJC transferred Mr. Hall to the day shift at Northeast Campus while TJC continued to investigate the circumstances surrounding his arrest. Ms. Wilson remained on Southeast Campus and was reassigned to clean a different building which was closer to the Campus Police Office. The only time Ms. Wilson saw Mr. Hall again was in the courthouse during Mr. Hall's criminal proceedings. While she remained at TJC, Ms. Wilson was supervised by Mr. Back, notwithstanding his alignment with Mr. Hall in the disputes and his efforts to discredit Ms. Wilson's claims. Ms. Wilson resigned

from her position at TJC on April 22, 1994, when she relocated to Missouri. Mr. Hall resigned from his position in August 1994 before the conclusion of the criminal proceedings against him.

Ms. Wilson brought suit against TJC and Kenneth Hall, in his capacity as TJC supervisor, alleging hostile work environment sexual harassment, quid pro quo sexual harassment, and retaliation in violation of Title VII. The court instructed the jury that in order to find TJC liable for hostile environment sexual harassment, Ms. Wilson had to prove by a preponderance of the evidence all of the following elements:

> First, she suffered from intentional discrimination because of her sex, by the intentional conduct of a fellow employee consisting of conduct of an unwelcome sexual motive, such as unwelcome propositions or advances. Second, the conduct was sufficiently severe or pervasive to alter the conditions of Ms. Wilson's employment to create an intimidating, hostile or offensive work environment. Third, the alleged conduct detrimentally affected Ms. Wilson. Fourth, the conduct would have detrimentally affected a reasonable person of the same sex in Ms. Wilson's position. Fifth, management level employees knew or should have known of the alleged sexual harassment described above, and sixth, management level employees failed to implement prompt and appropriate corrective action.
> In determining whether management level employees knew or should have known of the alleged sexual harassment, you may consider whether there were reasonable avenues available to Ms. Wilson to file a complaint of sexual harassment to management level employees. You may also consider whether or not the existing complaint practices and procedures at TJC were

-11-

effective. In determining whether the remedial action taken by a management level employee was appropriate, you should consider whether it was reasonably likely to prevent the misconduct from recurring.

Aplt. App. at 535-36. The jury found TJC liable for hostile environment sexual harassment, and awarded Ms. Wilson $100,000 in compensatory damages.

In denying TJC's motion for judgment as a matter of law on the hostile environment claim, the district court first held that TJC's sexual harassment policy was not sufficiently effective to insulate the college from liability. In so holding, the court observed that "[a] female employee who experiences threatening sexual behavior from a supervisor at night when the Personnel Office is closed would naturally go to the Campus Police to report the incident." Aplt. App. at 703. The court concluded that TJC's policy was materially deficient because it did not establish a procedure for employees who were harassed by their supervisors at night when the Administrative Offices were closed, or a procedure instructing the Campus Police on handling such complaints.

In addition to holding the TJC harassment policy inadequate with respect to the role of the Campus Police, the court also held that "the response of the Campus Police, once they became aware of the alleged incident, was grossly inadequate." Id. at 704. The court pointed to evidence that Mr. Weber did nothing for eight hours, neither reporting the incident to Personnel nor taking action to prevent Mr. Hall from repeating his threatening sexual behavior. The

-12-

court also pointed out that the investigation which was finally conducted put Mr. Hall on notice and his victim in jeopardy.

The court further held Ms. Wilson established that management-level employees at TJC knew or should have known of Mr. Hall's conduct and failed to take appropriate action. In the court's view, TJC knew by 7 a.m. on February 16, through Herb Weber, about the incident of harassment. The court stated that even if Mr. Weber were not considered management, he should have reported the incident to TJC management in light of the seriousness of the allegation. The court rejected TJC's argument that it had taken prompt appropriate remedial action, reiterating the evidence showing that the Campus Police personnel aggravated the threat to Ms. Wilson's safety by giving Mr. Hall notice of Ms. Wilson's call to the BAPD without keeping Ms. Wilson apprised of their actions. Despite TJC's assertions that Campus Police personnel could have done nothing because they did not want to interfere with TPD's undercover operation, the court pointed out that "the Campus Police never evinced an intention of protecting Wilson, preventing the reoccurrence of Hall's conduct, or even warning Wilson that Hall had been informed of her complaint." Id. at 707.

-13-

## II

TJC does not dispute the jury's conclusion that Mr. Hall's conduct towards Ms. Wilson created a hostile work environment amounting to actionable employment discrimination. The issue on appeal is whether the evidence is sufficient to sustain the jury's finding that TJC is liable for Mr. Hall's harassment. TJC contends it is insulated from liability because as a matter of law its harassment policies and procedures were adequate, Mr. Weber was not a management level employee for purposes of notification to the college, and its response was timely and appropriate. We disagree.

As set out above, the district court instructed the jury that TJC would be liable for Ms. Wilson's claim of sexual harassment if she proved by a preponderance of the evidence that "management level employees knew or should have known of the alleged sexual harassment . . . and . . . management level employees failed to implement prompt and appropriate corrective action." Aplt. App. at 536. The court further instructed the jury that in determining TJC's liability, it could consider "whether there were reasonable avenues available to Ms. Wilson to file a complaint of sexual harassment" and whether "the existing complaint practices and procedures at TJC were effective." Id. TJC does not contend the district court misstated the applicable law and the instructions comport with the cases stating the requirements for a hostile environment sexual

-14-

harassment claim based on negligence.[4]  See <u>Meritor Sav. Bank v. Vinson,</u>  447

U.S. 57, 72-73 (1986); <u>Adler v. Wal-Mart Stores, Inc.,</u> 144 F.3d 664, 673 (10th

---

[4]The Supreme Court recently addressed the issue of employer liability in *Faragher v. City of Boca Raton*, 118 S. Ct. 227 (1988), and *Burlington Indus., Inc. v. Ellerth*, 118 S. Ct. 2257 (1998).  In those cases, the Court dealt in detail with vicarious employer liability for the acts of a supervisory employee based on a claim that the supervisory employee's creation of a hostile work environment was significantly aided by the use of apparent authority.  In examining the contours of such a claim, the court held that an employer is vicariously liable for the misuse of supervisory authority that does not result in adverse employment action against the employee, subject to an affirmative defense requiring proof of two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington*, 118 S. Ct. at 2270; *Faragher*, 118 S. Ct. at 2292-93.

In contrast to the vicarious liability claims addressed in these cases, the only basis for employer liability that Ms. Wilson raised below was a negligence theory.  She alleged that TJC was itself negligent because it knew or should have known of the harassing conduct of Mr. Hall and failed to take appropriate action. The Supreme Court recognized in *Burlington* and *Faragher* the continuing validity of negligence as a separate basis for employer liability.  "[A]n employer can be liable . . . where its own negligence is a cause of the harassment.  An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it." *Burlington*, 118 S. Ct. at 2267; *see also Faragher*, 118 S. Ct. at 2294 (recognizing negligence as alternative to theory of vicarious liability based on misuse of supervisory authority); *Harrison v. Eddy Potash, Inc.*, No. 96-2045, 1998 WL 758401 (10th Cir. Oct. 30, 1998) (recognizing alternative negligence theory of liability after *Burlington* and *Faragher*).

Although many of the same facts will be relevant to both negligence and vicarious liability claims, in asserting that the employer was negligent the plaintiff bears the burden of establishing that the employer's conduct was unreasonable, while in a misuse of authority claim the employer bears the burden of establishing as an affirmative defense that it exercised reasonable care to prevent harassment.  The jury instructions here properly placed the burden on Ms. Wilson to prove the elements of her negligence claim.

Cir. 1998); Hirschfeld v. New Mexico Corrections Dep't, 916 F.2d 572, 577 (10th Cir. 1990). We therefore turn to whether the evidence is sufficient to support the verdict under the instructions given.

The first step of TJC's grievance procedure provides that a staff person who feels she has been sexually offended should report the incident to her supervisor. Aplt. App. at 133. The policy includes a way to bypass harassing supervisors by providing that if the employee feels uncomfortable discussing the incident with her supervisor, she should report it to the Director of Personnel Services. Id. The next step of the procedure instructs that "[i]f further action is necessary, the staff member . . . should file the complaint with the Director of Civil Rights." Id. Finally, the procedure states that "[i]t is the responsibility of each supervisor within his/her area of control to report all formal complaints to the Director of Civil Rights." Id.

In our view, the record supports a finding that the policy was deficient in several respects. We note in particular evidence that although the policy provides a mechanism for bypassing a harassing supervisor by reporting the harassment to the Director of Personnel, the Director's office is located in a separate facility and is not accessible during the evening or weekend hours when many employees and students are on the various campuses. In addition, while the final portion of the procedure does provide that it is the responsibility of supervisors to report

"formal complaints" within their area of control to the Director of Civil Rights, the policy does not define what constitutes a "formal complaint" as opposed to an informal one. Nor does the policy provide instruction on the responsibilities, if any, of a supervisor who learns of an incident of harassment through informal means. Indeed, TJC contends neither the Campus Police Supervisor, Mr. Weber, or his Assistant Supervisor, Mr. Read, had any obligation under its policy to report the incident to the Director of Civil Rights because Ms. Wilson did not make a "formal complaint" to the Campus Police.[5]

This evidence is sufficient to support the jury's determination that TJC had not provided reasonable avenues available to Ms. Wilson to file a harassment complaint with management level employees. "[A] procedure that does not require a supervisor who has knowledge of an incident of sexual harassment to report that information to those who are in a position to take action falls short of that which might absolve an employer of liability." Varner v. National Super Mkt., 94 F.3d 1209, 1214 (8th Cir. 1996). The record shows that Mr. Weber and

_____

[5] At trial, when questioned about this specific portion of the policy, both Mr. Weber and Mr. Read testified they did not believe they were under any obligation to report their knowledge of Mr. Hall's conduct to the Director of Civil Rights because Ms. Wilson had not made a "formal complaint" to the Campus Police. See Aplt. App. at 256-58, 303-05. When Mr. Read was asked "[i]f Ms. Wilson had approached you and told you that she wished to file a formal complaint of sexual harassment, what would you have done," he responded "I would have taken a complaint from her and either gone to Herman Robins [the Director of Civil Rights] or to my immediate supervisor." Id. at 277.

Mr. Read were made aware of the incident of harassment through Sgt. Martin of the BAPD, whom Ms. Wilson attempted to contact immediately after her confrontation with Mr. Hall occurred. Once aware of the incident, both Mr. Read and Mr. Weber testified that they were not responsible under TJC's sexual harassment policy to report the incident to the Director of Civil Rights because Ms. Wilson failed to make a "formal complaint" directly to them. In view of this evidence, the jury could have concluded that the grievance procedure was not reasonably effective because it did not extend to information acquired informally.

Finally, we observe that the policy did not provide a mechanism by which employees could report sexual harassment complaints after hours to the Campus Police or impose responsibilities on the Campus Police upon receiving such complaints. The President of TJC, Dean Van Treas, readily admitted that "[o]ne of the challenges you have at a school like ours is from midnight to 6:00 or 7:00, you don't have a lot of administration around." Aplt. App. at 409. In response to questions from the district court, Dean Van Treas conceded that he might expect a person who had been sexually harassed to make a complaint to the Campus Police, and admitted that TJC had no procedures, either formal or informal, requiring Campus Police to report complaints of sexual harassment to the Director of Civil Rights. Id. at 409-10. When Ms. Wilson was asked why she had not contacted Mr. Macon, Mr. Hall's supervisor, or the Director of Personnel the next

-18-

day as required by the policy, she testified she believed it was sufficient that she had contacted the Campus Police. Id. at 127-130. The testimony of Dean Van Treas and Ms. Wilson that an employee fearing for her safety would logically report a complaint of sexual misconduct by her supervisor to the Campus Police, especially after-hours when the Administrative Offices were closed, is evidence supporting a finding that the grievance procedure here, which did not provide an avenue for processing such complaints, was inadequate.

TJC argues that notice to Mr. Weber was not notice to the college because Mr. Weber was only a low-level supervisor. In the circumstances of this case, we disagree with this proposition. We have held that an employer is obligated to respond to harassment "of which it actually knew, or in the exercise of reasonable care should have known," and that "[a]ctual knowledge will be demonstrable in most cases where the plaintiff has reported harassment to management-level employees." *Adler v. Wal-mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998). We have further held that an employee who is a "low-level supervisor" may also be a management-level employee for purposes of imputing knowledge to the employer when he is titled supervisor and has some authority over other employees. *Id.* at 674.

We agree with the analysis in *Young v. Bayer Corp.*, 123 F.3d 672 (7th Cir. 1997), in which the court held that "what is certain is that if the company fails to

establish a clearly marked, accessible, and adequate channel for complaints, judicial inquiry will have to turn to who in the company the complainant *reasonably believed* was authorized to receive and forward (or respond to) a complaint of harassment." *Id.* at 674. Here, as discussed above, the jury could have found that the complaint procedure was inadequate by failing to provide an accessible channel for after-hours complaints and that Ms. Wilson was reasonable in believing Campus Police personnel were authorized to receive and respond to such complaints. An employer is obligated to respond to harassment of which it would have known in the exercise of reasonable care. The evidence is sufficient to establish that TJC did not exercise reasonable care in setting out the channels by which it could receive reports of after-hours harassment, and it is therefore in no position to rely on those inadequate channels to claim that it did not receive notice.

Finally, the jury reasonably could have found that TJC failed to take timely and sufficient remedial action. As the district court instructed, the jury was entitled in making this assessment to "consider whether [the remedial action taken] was reasonably likely to prevent the misconduct from recurring." Aplt. App. at 536. We have recognized that "whether the response was proportional to the seriousness . . . of the harassment" is one of the factors relevant to whether the employer's response was adequate. *See Adler*, 144 F.3d at 676. Our review

of the record persuades us the jury had sufficient evidence to support its determination that TJC's response to Mr. Hall's conduct was inadequate given its seriousness.

Although Mr. Weber learned of the alleged incident at 7:00 a.m. through Sgt. Martin of the BAPD, he did not attempt to gather more information about the report. Instead, at the close of his shift he instructed Mr. Read to investigate the matter. Mr. Read, in turn, questioned only Mr. Hall about the incident and allowed Mr. Hall to gather information and witnesses to support his version of the facts. Mr. Read did not question Ms. Wilson regarding her claims against Mr. Hall, nor did he warn Ms. Wilson that Mr. Hall was aware she had contacted the BAPD.[6] Although TJC may be correct in asserting that the Campus Police could not have been expected to prevent another confrontation between Mr. Hall and Ms. Wilson in light of the TPD's undercover operation, the jury could have reasonably found that TJC's response was nonetheless inadequate in light of the seriousness of the allegations of criminal sexual misconduct.[7]

---

[6]In fact, Officer Crocker testified at trial that subsequent to her arrest of Mr. Hall, Mr. Read called her and angrily asserted she should not have arrested Mr. Hall "based on what Ms. Wilson told me because she was known as a liar and . . . was a trouble maker." Aplt. App. at 231.

[7]An employer's failure to fully investigate a complaint supports a finding that its response was inadequate. *See Ellison v. Brady*, 924 F.2d 872, 881 (9th Cir. 1991). Moreover, an employer's decision to do nothing on the basis of an inadequate investigation likewise supports a finding that the employer did not

(continued...)

## III

Since we cannot conclude that the "evidence points but one way and is susceptible to no reasonable inferences supporting" Ms. Wilson's position, judgment as a matter of law is not warranted. Our review of the record persuades us the jury had sufficient evidence before it to find that TJC's sexual harassment policy was not effective or suitable to the employment circumstances, and that its response was inadequate in the circumstances of this case.

We **AFFIRM** the judgment of the district court.

---

[7](...continued)
take prompt and effective remedial action. *See Hathaway v. Runyon*, 132 F.3d 1214, 1224 (8th Cir. 1997).

No. 96-5234, <u>Wilson v. Tulsa Junior College</u>

**BRISCOE**, Circuit Judge, concurring:

Frances Wilson pursued and prevailed at trial on a theory of direct employer liability under Title VII for sexual harassment perpetrated by her direct supervisor. In particular, she alleged, and the jury agreed, that Tulsa Junior College (TJC) knew or should have known of the harassment but failed to take appropriate corrective action. <u>See generally</u> <u>Burlington Industries, Inc. v. Ellerth</u>, 118 S. Ct. 2257, 2267 (1998) (acknowledging theory of direct employer liability). In this appeal, we are asked to determined whether there is a legally sufficient evidentiary basis for the jury's verdict. <u>See</u> <u>Harolds Stores, Inc. v. Dillard Dept. Stores</u>, 82 F.3d 1533, 1546 (10th Cir. 1996) (discussing standard of appellate review for district court's ruling on motion for judgment as a matter of law).

Viewing the evidence in Wilson's favor, I too would affirm but would limit the basis for affirmance. Like Chief Judge Seymour, I agree that TJC had actual knowledge of the harassment through Mr. Weber. More specifically, I am persuaded that Mr. Weber's job responsibilities were such that his knowledge of the harassment should be imputed to TJC for purposes of Title VII. <u>See</u> <u>Distasio v. Perkin Elmer Corp.</u>, 157 F.3d 55, 63 (2d Cir. 1998) (under Title VII, official's actual knowledge will be imputed to employer if official is sufficiently high in management hierarchy to qualify as proxy, if official is charged with duty to act on the knowledge and stop the harassment, or if official is charged with duty to

inform employer of the harassment); <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 673 (10th Cir. 1998) (actual knowledge will be demonstrable in most cases where harassment has been reported to management-level employees). Not only did Mr. Weber act on his knowledge by directing TJC employees to investigate the harassment, I believe he had a duty, flowing from his role as Campus Police Supervisor and not because of any provision in TJC's sexual harassment policy, to inform other TJC officials of sexual harassment reported to him. Given TJC's actual knowledge of the harassment, we need not address whether TJC's sexual harassment policy was effective. This question would only come into play if we were addressing whether TJC *should have known* of the harassment.

96-5234, <u>Wilson v. Tulsa Junior College</u>

**EBEL, Circuit Judge, dissenting**

I recognize that there has been a jury verdict for Ms. Wilson and, in considering TJC's motion for judgment as a matter of law, we must interpret the evidence most favorably to Ms. Wilson. However, after careful consideration, I am convinced that this record is simply inadequate to support a jury verdict for Ms. Wilson. Accordingly, I would reverse and rule that the district court erred in failing to grant TJC's motion for judgment as a matter of law on the hostile environment claim.

First, I believe as a matter of law that TJC's anti-harassment policies and procedures were adequate. TJC had a strong anti-discrimination policy. It provided explicit directions on where complaints should be lodged, and those directions included a provision allowing the victim to bypass her supervisor if the harassment implicates the supervisor. Many courts have found policies with similar anti-discrimination and reporting provisions to be reasonable. <u>See</u>, <u>e.g.</u>, <u>Farley v. American Cast Iron Pipe Co.</u>, 115 F.3d 1548, 1553 (11th Cir. 1997); <u>Wathen v. General Elec. Co.</u>, 115 F.3d 400, 407 (6th Cir. 1997); <u>Bouton v. BMW of North America, Inc.</u>, 29 F.3d 103, 107 (3rd Cir. 1994); <u>Knabe v. Boury Corp.</u>, 114 F.3d 407, 413-14 (3rd Cir. 1997). I do not believe that TJC's policy can be faulted because the reporting must be made during regular working hours or because the Director of Personnel Services is located in a different building.

Second, as a matter of law, I do not believe that TJC received, or should have received, actual knowledge of this act of harassment at 7:00 a.m. on February 16 when the Broken Arrow Police Department reported it to Mr. Weber, the campus police supervisor for the southeast campus. This report did not disclose the identity of the victim. In any event, Mr. Weber was not management at TJC and his position was not at a sufficient level that knowledge possessed by him should be attributed to TJC. Although the campus police had responsibility to maintain physical security on the campus, the campus police had no general reporting responsibilities for sexual harassment claims under TJC's anti-discrimination policy (other than harassment occurring within its own department). The reporting avenues for a formal discrimination claim were made quite clear in TJC's policies, and Ms. Wilson was aware of them. As a matter of law, TJC cannot be held liable because other informal routes by which others might by happenstance have notified management or the Director of Personnel Services of this incident did not materialize in the 17 hours or so prior to the time Mr. Hall was arrested.

Third, as a matter of law, I believe that TJC's response was timely and appropriate. As soon as management did learn of this incident, it immediately suspended Mr. Hall. When Mr. Hall was reinstated three weeks later, he was transferred to a different shift and a different location and Ms. Wilson was reassigned to a different building closer to the campus police office. No further incidents occurred between Ms. Wilson and Mr. Hall. Thus, TJC's response was immediate and effective.

In summary, here TJC did everything that the law requires it to have done. It has a clear and forceful anti-discrimination policy. It enforced it vigorously and effectively as soon as it learned of the incident. To the extent that Ms. Wilson had minimal (and monitored) further contact with Mr. Hall the day after the initial incident, that was her informed choice. She was working in collaboration with the Tulsa Police Department to perform an undercover sting operation to confirm Mr. Hall's inappropriate conduct, and that operation was completely successful. I do not believe that she can hold TJC accountable for that brief second encounter when she elected to have it take place of her own volition and when it could have been avoided had she simply followed the clear reporting procedures made available to her by TJC.

Accordingly, I respectfully dissent.