**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**June 19, 2014**

**TENTH CIRCUIT**

THE UNITED STATES FOR THE USE
AND BENEFIT OF MMS
CONSTRUCTION & PAVING, L.L.C.,
an Oklahoma limited liability company,

       Plaintiff Counterdefendant -
       Appellee,

v.

WESTERN SURETY COMPANY, a
South Dakota entity; APAC-CENTRAL,
INC., a Delaware corporation,

       Defendants - Appellants,

and

HEAD, INC., an Ohio corporation,

       Defendant Counterclaimant -
       Appellant.

No. 13-6076

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 5:10-CV-01340-M)**

Jay P. Walters (Bryan N.B. King, K. McKenzie Anderson, with him on the briefs), Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Oklahoma, for Defendants Counterclaimants - Appellants.

Lance E. Schneiter, Schulte, Schneiter & Gibson, P.L.L.C., Kingfisher, Oklahoma, for Plaintiff Counterdefendant - Appellee.

---

Before **HARTZ**, **EBEL**, and **PHILLIPS**, Circuit Judges.

---

**HARTZ,** Circuit Judge.

---

MMS Construction & Paving, L.L.C. entered into a subcontract with Head, Inc. to pave asphalt runway shoulders at Altus Air Force Base in Oklahoma. The project was delayed and MMS, expressing concern that Head had not been making agreed payments, quit the job. MMS also complained that completing the job would be more expensive than it originally believed because certain requirements were being imposed that Head had said would be waived. After MMS quit, Head finished the job, relying on other subcontractors.

MMS sued Head on state-law claims of breach of contract, tortious breach of contract, quantum meruit (unjust enrichment), and misrepresentation, and brought a claim under the federal Miller Act, 40 U.S.C. §§ 3131–34 (formerly 40 U.S.C. §§ 270(a)–270(d)), on Head's surety bond for the project. Head filed a counterclaim, alleging that MMS breached the contract. After a jury trial, MMS was awarded $801,575.65 in damages and $60,826.05 in attorney fees. Head filed a motion for judgment as a matter

2

of law, under Fed. R. Civ. P. 50(b), or for a new trial, under Fed. R. Civ. P. 59, which the district court denied.

Head appeals, arguing: (1) the evidence at trial was insufficient to show that Head breached the contract; (2) if there was a breach, it was not material; (3) an Oklahoma statute limited MMS's breach-of-contract damages to the amount unpaid plus interest; (4) the evidence was not sufficient to establish MMS's alleged lost-profits damages for breach of contract; (5) MMS did not present sufficient evidence to prove misrepresentation or any damages from misrepresentation, MMS waived the misrepresentation claim, and the award of misrepresentation damages duplicated the award of damages for breach of contract; and (6) MMS was not entitled to attorney fees from Head because the Miller Act does not allow recovery of those fees. Exercising jurisdiction under § 1291, we reverse the award of damages on the misrepresentation claim because the jury's award was not supported by any evidence at trial. On all other issues we affirm the district court: There was sufficient evidence to show that Head breached the contract by not paying sums owed to MMS; Head did not preserve its arguments on the materiality of the breach and on its claim that recovery should be limited by an Oklahoma statute; there was sufficient evidence to support lost-profits damages; and MMS was entitled to attorney fees on its state-law breach-of-contract claim.

I.     **BACKGROUND**

Head is a corporation that works on "horizontal surfaces" at airports, including "surfaces, concrete, asphalt, gravel surfaces, drainage, [and] underground electric." Aplt. App., Vol. V at 1691–92. It prepared a bid on a project to repair runways at Altus Air Force Base and reached out to potential subcontractors to lay the asphalt runway shoulders. The Army Corps of Engineers (Corps) required the work to be done with an asphalt plant on-site instead of bringing in asphalt from an external plant. One of the companies contacted was MMS, an Oklahoma asphalt and concrete company owned by Mike Matthews and two partners. In December 2009, MMS gave Head an estimate. Head was awarded the contract as general contractor in early February 2010.

After the Corps awarded the bid to Head, MMS read the project specifications. It became concerned that some of the specifications for work on the asphalt shoulders would impose large expenses not taken into account in its original estimate to Head. On February 12, MMS and Head had a meeting during which they discussed the specifications, particularly whether MMS (1) would need to use a material transfer vehicle (MTV) to transport asphalt, and (2) would have to comply with "ride specifications," which related to the smoothness of the asphalt. *Id.* at 1601. At this meeting Jim Head, president of Head, stated that he "never had to use [an MTV]" for shoulders, *id.* at 1604, and that "generally smoothness requirements are never enforced on shoulders." *Id.* at 1601. MMS claims that these statements constituted a fraudulent misrepresentation that the two specifications would not be enforced.

4

In March, MMS sent a letter to Head asking for a formal commitment to work together on the project. The letter set forth a payment plan, including a price per ton for asphalt laid, various monthly payments, and payments to be made when the asphalt plant was mobilized. Mr. Head initially scratched out the monthly-payment and mobilization terms in the letter and replaced them with a higher per-ton-laid price. MMS responded by resending the letter with the language, "When our letter of intent was sent back in small letters it said payment was base per ton. We wanted to make sure for clarification reasons that our bid was understood. MMS based our bid on payments for mobilization, plant rental and other expenses listed." *Id.* at 1814. The letter then relisted payment amounts it expected: a price of $84.50 per ton of "[a]sphalt laid in place"; $40,000 for mobilization of the asphalt plant and $12,500 for environmental permits, both to be paid when the plant was in place; and $12,499.99 per month for testing, plant lease, and lodging. *Id.* As Mr. Matthews testified, the monthly payments were "to make sure [MMS] got enough a month to survive, basically, until [it] poured," *id.*, Vol. IV at 1223, in part because it needed to hire personnel to be on site ready to go. Mr. Head signed the letter on March 26. He testified that he viewed the letter as a binding agreement. The letter will be referred to as the "March Agreement."

Head later asked MMS to sign a subcontract. Although the subcontract was dated April 2, Head did not receive a copy signed by MMS until May 28. The subcontract contained the payment terms from the March Agreement and contained no terms inconsistent with that agreement, although it required MMS to submit "applications for

5

payment in such reasonable time as to enable [Head] to apply for payment under the Contract [between Head and the Corps]." *Id.*, Vol. V at 1819. MMS began to move its asphalt plant to Altus Air Force Base on May 17. In late May, MMS decided it needed to acquire an MTV.

By August, MMS was unhappy with Head because it believed that Head was blaming MMS for delays on the project, was going to back-charge MMS for these delays, and was delinquent in payments owed to MMS. Mr. Matthews testified that MMS had expected to be paid the monthly payments "right after" the March Agreement was signed. *Id.*, Vol. IV at 1421. Also, MMS had mobilized its plant by July 1 and expected to be paid $40,000 for plant mobilization and $12,500 for the Oklahoma Department of Environmental Quality (DEQ) control fee. It claimed it had invoiced $12,499.99 (for a monthly payment) on May 28; $64,999.99 (for a monthly payment, the DEQ fee, and mobilization) on July 1; and $12,499.99 (for a monthly payment) on August 4, for a total of $89,999.97. Head paid MMS $20,000 in mid-July and $24,999.99 in early August, for a total of $44,999.99.

MMS and Head officers had a series of phone conversations, and on Friday, August 13, MMS believed that by Monday morning it would receive an express delivery from Head with money and a letter stating that MMS would not be back-charged. When nothing arrived on Monday morning, MMS sent a letter terminating the contract for lack of payment, claiming $44,999.98 was due. The letter also said that "it is very likely Head fraudulently induced MMS to enter into the Subcontract by intentionally withholding the

6

required specifications. *Id.*, Vol. VI at 1856. It mentioned delays but nothing about back charges. Head then hired other subcontractors to complete the work. The subcontractors at times used an MTV and special equipment for complying with ride specifications.

MMS brought suit in the United States District Court for the Western District of Oklahoma against Head and Western Surety Company, which had issued Head's payment bond required under the Miller Act.[1] The jury found against Head on MMS's breach-of-contract claim and awarded $651,575.65 for lost profits, unpaid invoices, and various expenses that MMS would have recouped when paid for laying asphalt. It also awarded $150,000 on MMS's misrepresentation claim and ruled in MMS's favor on Head's counterclaim. On MMS's quantum-meruit claim the jury rendered an advisory verdict for MMS in the amount of $350,000, but the district court rejected the jury's advice and ruled in Head's favor on this claim because MMS's work had been fully compensated by the award for breach of contract. The court entered judgment on the jury's verdicts and awarded $651,575.65 against Western Surety on its bond.

Head unsuccessfully moved for a directed verdict under Fed. R. Civ. P. 50(a) at the close of MMS's case and at the close of all evidence. After the jury verdict and the court's entry of judgment, Head moved for judgment as a matter of law or, alternatively,

---

[1] MMS also sued one of the subcontractors who finished the job, APAC-Central, Inc., for conversion and unjust enrichment relating to APAC's alleged use of a mix design that MMS had secured for the project. The court granted summary judgment in APAC's favor on the conversion claim, and awarded MMS $1,750 on the unjust-enrichment claim. These claims are not at issue on appeal.

7

a new trial under Fed. R. of Civ. P. 50(b) and 59.  The court again denied relief.  It then partially granted MMS's motion for attorney fees, agreeing that MMS was entitled under Oklahoma law to attorney fees on its breach-of-contract claim and ordering Head to pay MMS $60,826.05.

## II.    DISCUSSION

We address in turn Head's four unsuccessful challenges to the breach-of-contract award, its successful challenge to the misrepresentation award, and its unsuccessful challenge to the attorney-fee award.

### A.    Breach of Contract

#### 1.    Sufficiency of the Evidence of Breach

Head argues that the district court should have granted its postverdict motion for judgment as a matter of law or alternatively for a new trial on the ground that there was insufficient evidence that it breached its contract with MMS.  We are not persuaded.

"We review de novo a district court's disposition of a motion for judgment as a matter of law, applying the same standard as the district court.  Judgment as a matter of law is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Wilson v. Tulsa Junior Coll.*, 164 F.3d 534, 536 (10th Cir. 1998) (internal quotation marks omitted).  Nevertheless, "we must enter judgment as a matter of law in favor of the moving party if there is no legally sufficient evidentiary basis with respect to a claim or defense under the controlling law." *Id.* (ellipses and internal quotation marks omitted).  In our review we

will not "weigh the evidence, pass on the credibility of the witnesses, or substitute our conclusions for that of the jury." *Id.* (internal quotation marks omitted). That is, we view "the evidence and inferences therefrom" in the light most favorable to the nonmoving party. *Id.* (brackets and internal quotation marks omitted).

In reviewing the denial of a motion for a new trial "on the ground that the verdict is against the weight of the evidence," we will not reverse "unless the verdict is clearly, decidedly, or overwhelmingly against the weight of the evidence." *Murphy Oil USA, Inc. v. Wood*, 438 F.3d 1008, 1020 (10th Cir. 2006).

MMS argues that Head breached their contract because it paid only $44,999.99 of the $89,999.97 set forth on invoices dated May 28, July 1, and August 4, 2010. The invoices included (1) three monthly charges of $12,499.99 for testing, plant lease, and lodging; (2) $40,000 for mobilization of the asphalt plant; and (3) $12,500 for the DEQ fee.

Head responds that there was insufficient evidence that it owed MMS any money when MMS terminated the contract. It asserts that MMS was required to submit invoices to Head and that payment was not due until 30 days later, or longer if the Corps had not paid Head the money MMS was requesting in the invoice. According to Head, it received only two invoices from MMS before MMS quit. The first was for $64,999.99. Although it was dated July 1, Head claims that it was received on July 20. The parties agree that Head paid $44,999.99 on this invoice—$20,000 paid by a July 16 check (based on an internal Head invoice dated June 1) and the remainder paid in late July or early

9

August. The payment included $20,000 for half of the mobilization of the asphalt plant; $12,500 for the DEQ fee; and $12,499.99 for a monthly charge. Head argues that the remaining $20,000 for plant mobilization requested in this invoice was not due when MMS quit because the Corps had not yet paid Head that amount. The second invoice, for $12,499.99, was dated and received on August 4. Head contends that it did not have to pay this invoice before MMS quit on August 16 because it was not due until September 4, thirty days after the invoice was received.

The evidence at trial sufficed to support MMS's claim. First, although the subcontract required MMS to submit "applications for payment in such reasonable time as to enable [Head] to apply for payment under the Contract [between Head and the Corps]," Aplt. App., Vol. 5 at 1819, the jury could reasonably infer that the monthly payments of $12,499.99 were due at the end of each month, and without the need for MMS to submit an invoice. The March Agreement required the payments, which were due regardless of whether MMS was laying asphalt. Indeed, MMS needed the payments precisely when it was not earning money from laying asphalt because it would still incur expenses from being on site and ready to go. Mr. Matthews testified that the monthly payments were supposed to begin after the March Agreement was signed in late March. Also, nothing in the record suggests that Head was being reimbursed by the Corps for these monthly payments or needed to submit to the Corps invoices from MMS for the payments (as opposed to invoices for asphalt laid), so MMS invoices would not be needed "to enable [Head] to apply for payment under the Contract." *Id.*

10

Second, Head's actions indicated that it recognized its duty to pay for the plant mobilization without receiving an invoice. Presumably it could easily determine on its own whether mobilization was complete; and Head's own evidence was that it paid MMS $20,000 for mobilization with a check dated July 16 even though it claims that it did not receive an invoice until July 20. The payment is explained in a Head document dated October 2010, after MMS quit: "After an attempt to get MMS to invoice the 50% Asphalt Plant Set-up that Head, Inc received from the Gov't, Head Inc drew up an invoice titled Invoice No. 1 dated June 1, 2010 for MMS . . . ." *Id.*, Vol. VI at 1866. Head apparently received money from the Corps before it had submitted any invoice (prepared by itself or by MMS) to the Corps, indicating that it did not need invoices from MMS to be paid.

If the mobilization-related charge and the monthly payments were due without MMS invoices, Head had breached its duty to pay by the time MMS quit in August. Because mobilization was complete as of July 1, MMS would have been owed about $90,000 by August 1 for monthly payments and the charges for plant mobilization and the DEQ permit (which, according to the March agreement, was due upon plant mobilization). Yet Head paid only $44,999.99, covering the DEQ permit, one monthly payment, and half of the mobilization charge.

In addition, even assuming that MMS did need to submit invoices, the evidence shows that Head still owed MMS $20,000 on the July 1 invoice (for half the mobilization fee) when MMS left the job. Head argues that this amount was not yet due because Head

11

was waiting for payment from the Corps of half the mobilization fee.  But evidence at trial showed that at the time of termination the Corps had paid Head $76,999 for work attributable to MMS, yet Head had paid MMS only $49,999.  Some of this payment might have represented overhead and profit for Head, but Head has made no attempt to identify how much of it was meant for these purposes.

We hold that the evidence sustained the jury's finding that Head breached its contract to pay MMS.  *See Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758, 763 (10th Cir. 1997) (deferring to jury when there was conflicting evidence on whether a subcontractor was owed payment).

### 2.    Materiality

Head argues that even if it owed MMS as much as $45,000 at the time that MMS quit, this deficiency was not material.  We decline to address this argument because Head did not raise it in its postverdict motion for judgment.

The Supreme Court has emphatically stated that federal courts of appeal are "powerless" to set aside a judgment on the ground of insufficient evidence unless the appellant filed a postverdict motion under Fed. R. of Civ. P. 50(b) seeking that relief. *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 405 (2006).  It explained that such a motion is essential "because determination of whether a new trial should be granted or a judgment entered under Rule 50(b) calls for the judgment in the first instance of the judge who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart." *Id.* at 401 (brackets and internal quotation marks

12

omitted). This rationale also explains why relief cannot be granted in an appeal on a ground not presented to the district court in a Rule 50(b) motion that presented other grounds for relief. *See, e.g.*, *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1229 (10th Cir. 2000) ("'The statement of one ground precludes a party from claiming later that the motion should have been granted on a different ground.'" (quoting 9A Charles Allan Wright & Arthur R. Miller, Federal Practice and Procedure § 2533 (2d ed. 1995))); *Vanderhurst v. Colo. Mountain Coll. Dist.*, 208 F.3d 908, 915 (10th Cir. 2000) ("[A] Rule 50 motion for judgment as a matter of law made at the close of all the evidence preserves for review only those grounds specified at the time, and no others." (brackets and internal quotation marks omitted)).

Here, Head's Rule 50(b) motion argued several grounds for relief, including the argument that it owed MMS no money when MMS quit work. But it never argued that even if it owed MMS some money, the debt was immaterial. The issue is therefore not before us on appeal.

### 3.    Measure of Damages

Head argues that MMS's damages for breach of a contract to pay money are limited by Oklahoma Statute Title 23, § 22 to the amount not paid plus interest. Head did not raise this issue in district court. Its only mention of § 22 was in its motion for summary judgment. The motion quoted the statute under the heading "Applicable Rules of Law" in its section on the claims for tortious breach of contract and punitive damages; and even there the statute was not addressed, or even cited, in the "Argument" portion of

13

that section.  Aplt. App., Vol. I at 42–45.  More importantly, Head did not move for summary judgment on MMS's breach-of-contract claim, and Head never argued in district court that § 22 limited the damages available under that claim and never cited the provision again.  Head has suggested no reason why we should depart from our general rule that "we will not consider arguments raised for the first time on appeal." *Valdez v. Squier*, 676 F.3d 935, 950 (10th Cir. 2012) (internal quotation marks omitted).

### 4.      Sufficiency of Evidence of Lost Profits

Head next argues that the damages award to MMS for breach of contract was improper because insufficient evidence supported an award of lost profits.  Head raised this issue in its Rule 50(b) motion.  We reject the argument.

Head asserts that lost profits were improperly awarded because they were based "solely on unsubstantiated and speculative testimony from Mr. Matthews."  Aplt. Br. at 38.  In this diversity case we apply Oklahoma substantive law, including Oklahoma's law of damages.  *See Speciality Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1175 (10th Cir. 2008); *see also Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 398 (5th Cir. 2013) ("The law governing what damages are recoverable is substantive.").  Oklahoma law "allows businesses to recover lost future profits so long as they can demonstrate that those loses are capable of reasonably accurate measurement or estimate." *Specialty*

14

*Beverages*, 537 F.3d at 1178 (internal quotation marks omitted).[2]  In a breach-of-contract

case, the plaintiff must show that "such profits were reasonably certain to have been

made by the non-breaching party absent breach."  *See Florafax Int'l, Inc. v. GTE Market

Res., Inc.*, 933 P.2d 282, 296 (Okla. 1997).

At trial Mr. Matthews testified about how he came up with his initial bid.  He said

that he expected to make a profit of $600,000 if everything went according to plan.  To

calculate his actual lost profits, he then subtracted his "anticipated overruns," which

represented "mistakes that you make, things that occur during the project that you—that

you have to take the overruns into consideration for penalties."  Aplt. App., Vol. IV at

1327.  From what he knew after the contract was terminated, he calculated this amount as

$250,000.  That left $350,000 in lost profits.  Head did not present any evidence to

challenge Mr. Matthews's calculation.  This evidence sufficed for the jury to decide that

MMS was reasonably certain to make these lost profits.  *See Sw. Stainless, LP v.

Sappington*, 582 F.3d 1176, 1186–87 (10th Cir. 2009) (awarding lost profits based on

testimony by salesman who prepared bid that profit margin was 15%); *see also* Fed. R.

Evid. 701 advisory committee's note (2000 Amendments) ("[M]ost courts have permitted

the owner or officer of a business to testify to the value or projected profits of the

---

[2] Accordingly, the jury was instructed:  "The amount of damages does not have to be proved with mathematical certainty, but there must be a reasonable basis for the award." Aplt. App., Vol. I at 249.

15

business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert.").

**B.      Misrepresentation**

MMS claimed that it was entitled to damages based on misrepresentations made by Head intentionally or with reckless disregard for the truth.  It contends that Head falsely told it that ride specifications, which are measures of smoothness, would not be enforced on the work that MMS was carrying out and that an MTV would not be needed on the project.  Mr. Matthews testified that part of the reason that he entered into an agreement with Head to do the work at the same price as the estimate was that he incorrectly believed that these specifications would not be enforced.  The jury awarded MMS $150,000 on this claim.

Head challenges the $150,000 judgment, asserting (1) that MMS did not present evidence of damages from the alleged misrepresentations, (2) that there was insufficient evidence to prove that it made any misrepresentation, (3) that MMS waived the claim, and (4) that any recovery for misrepresentation was duplicative of damages already awarded for breach of contract.  We agree that MMS failed to prove any damages caused by misrepresentation.  Therefore, we need not address Head's other arguments on this point.

"Damages, to be recoverable, must be suscept[i]ble of ascertainment in some manner other than by mere speculation, conjecture or surmise, and by reference to some definite standard."  *Great W. Motor Lines, Inc. v. Cozard*, 417 P.2d 575, 578 (Okla.

1966).  No witness at trial ever identified damages owed to MMS as a result of misrepresentation, and MMS's attorney in closing argument never identified the amount of money MMS was seeking on this claim or illustrated how he thought the jury should calculate the amount.  Nor do any district-court documents suggest what the alleged damages were.  The pretrial order lists the damages on the misrepresentation claim as "amount to be determined."  Aplt. App., Vol. I at 207.  And the jury instruction on the claim states only, "One who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any injury which he thereby suffers."  *Id.* at 257.

On appeal MMS presents four arguments to support the jury's award.  First, MMS argues that Oklahoma law allows the award of damages for "loss of time, inconvenience and expense."  Aplee. Br. at 46.  As evidence of such damages, it points to "payroll or time records relating to the hours spent mobilizing MMS's asphalt plant prior to June 13, 2010"; "transportation charges to bring the MTV that was used on the Project to Altus from northern South Dakota"; "vehicle expenses incurred while driving back and forth to Altus"; and interest on debt under MMS's line of credit.  *Id*.  But even though those payroll and time records were mentioned at trial, they were neither admitted into evidence nor summarized; nor was any evidence admitted regarding transportation charges for the MTV, vehicle expenses for driving back and forth to Altus, or interest on the line of credit.  Moreover, Mr. Matthews testified that MMS was not asking for the MTV transportation charges as damages in this lawsuit, and MMS has offered no

17

explanation of how the other expenses were caused by the misrepresentations that Head made about the MTV or the ride specifications. (Mr. Matthews also testified that MMS was not asking for reimbursement for the amount it cost to buy an MTV.)

Second, MMS argues that the jury's advisory verdict of $350,000 on MMS's unjust-enrichment claim, which was not accepted by the judge, is "instructive on the amount of total damages the jury believed MMS deserved based on the evidence presented" and shows that MMS had substantial expenses associated with preparing the mix design for the asphalt used on the project. *Id.* at 47 n.5. But the unjust-enrichment claim against Head sought quantum-meruit damages for materials MMS provided for the project and work that MMS did on the project, and MMS has not challenged the district court's ruling that MMS was compensated for these damages when it recovered under its breach-of-contract claim. MMS has provided no explanation of how the quantum-meruit award measures damages incurred by MMS as a result of Head's alleged misrepresentations.

Third, MMS argues that the misrepresentation damages could compensate MMS for the loss of its bonding capacity, which prevented MMS from bidding larger jobs. But while there was testimony that MMS lost bonding capacity because of this job, there was no attempt by MMS to quantify the injury that resulted or to tie the loss to Head's misrepresentations.

MMS's final argument is that the damages are justified in light of Mr. Matthews's testimony that he subtracted $250,000 from his anticipated profits on the job because of

18

estimated overruns.  His testimony, however, does not link the overruns to any alleged

misrepresentation made by Head.  He stated:

> Overruns are basically mistakes that you make, things that occur during the
> project that you—that you have to take the overruns into consideration for
> penalties.  I mean, there is a lot of stuff that goes into overruns, but it is a
> table that we use.  I think we did this overrun after the fact and we used this
> overrun on the specifications, as if it was a Corps' job.

Aplt. App., Vol. IV at 1327.  This testimony does not establish that the overrun amount

was tied to the ride specifications or the use of an MTV, or what portion of the overrun

amount he estimated would have related to those specifications.  In fact, earlier he had

testified that in every bid he had to allow for mistakes, and that if you bid as if you were

"going to do a perfect job everytime" then you would not "be in business."  *Id.* at 1221.

There was no evidence that the overruns he contemplated in assessing lost profits were

anything other than normal overruns factored into each job.

MMS did not show specific damages from alleged misrepresentations or provide

the jury with a method for calculating these damages, so the jury's award of these

damages must be reversed.

### C.    Attorney Fees

Head's final argument is that the district court erred by awarding attorney fees to

MMS because attorney fees are not generally recoverable under the Miller Act and no

exception to the rule was present in this case.

The purpose of the Miller Act is "to protect persons supplying labor or materials

for federal construction projects, which are not subject to state mechanics' liens."  *J.W.*

*Bateson Co. v. United States ex rel. Bd. of Trustees*, 434 U.S. 586, 600 (1978). The Act requires general contractors on federal contracts exceeding $100,000 to obtain surety bonds, *see* 40 U.S.C. § 3131(b), and permits subcontractors to sue on the bonds in federal court, *see id.* § 3133(b). The Supreme Court in *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116 (1974), held that attorney fees are not authorized by the Miller Act, and we followed *F.D. Rich* in *United States ex rel. C.J.C., Inc. v. Western States Mechanical Contractors, Inc.*, 834 F.2d 1533 (10th Cir. 1987).

This case is not governed by those precedents. Although MMS sued Western Surety under the Miller Act, its claims against Head—including its breach-of-contract claim—were all under state law. The award of attorney fees on the breach-of-contract claim was therefore proper. The Fifth Circuit approved a similar award in *United States ex rel. Varco Prudent Bldgs. v. Reid & Gary Strickland Co.*, 161 F.3d 915, 918–19 (5th Cir. 1998), stating that Supreme Court precedent did not "prohibit an award of attorneys' fees under a state claim over which the court has exercised supplementary jurisdiction in a Miller Act case." Nothing in the text or purposes of the Miller Act suggests that when Congress required subcontractors to be protected by surety bonds, it intended to limit the state-law remedies that subcontractors have against general contractors. We need not decide whether the Act restricts state-law remedies against the sureties who issue Miller Act bonds, an issue that has divided other courts. *Compare United States ex rel. Metric Elec., Inc. v. Enviroserve, Inc.*, 301 F. Supp. 2d 56, 69, 74–75 (D. Mass. 2003) (rejecting attorney-fee award against Miller Act surety on state-law claim) *with K-W Indus. v. Nat'l*

20

*Sur. Corp.*, 855 F.2d 640, 643 (9th Cir. 1988) (holding Miller Act surety liable under state unfair-insurance-claims-practices statute).

## III.   CONCLUSION

We REVERSE the district court's denial of Head's Rule 50(b) motion regarding MMS's misrepresentation claim, and REMAND for the necessary revision of the judgment.  We AFFIRM the district court's decision regarding all other issues raised in this appeal.