FILED
United States Court of Appeals
Tenth Circuit

February 21, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

_____

CELIA VALDEZ; GRACIELA
GRAJEDA; SHAWNA ALLERS;
JESSE RODRIGUEZ,

      Plaintiffs-Appellees,

v.

SIDONIE SQUIER, in her official
capacity as Secretary of New Mexico
Human Services Department; TED
ROTH, in his official capacity as the
Acting Director of the Income Support
Division of the New Mexico Human
Services Department; JULIE
WEINBERG, in her capacity as the
Acting Director of the Medical
Assistance Division of the New
Mexico Human Services Department,

      Defendants-Appellants,

DIANNA J. DURAN, in her official
capacity as New Mexico Secretary of
State; DOROTHY RODRIGUEZ, in
her capacity as the Secretary of the
New Mexico Taxation and Revenue
Department; MICHAEL SANDOVAL,
in his capacity as the Director of the
Motor Vehicle Division of the New
Mexico Taxation and Revenue
Department,

      Defendants.

----------------------

No. 11-2063

UNITED STATES OF AMERICA,

    Amicus Curiae.

---

CELIA VALDEZ; GRACIELA GRAJEDA; SHAWNA ALLERS; JESSE RODRIGUEZ,

    Plaintiffs-Appellees,

v.

DIANNA J. DURAN, in her official capacity as New Mexico Secretary of State,

    Defendant-Appellant,

SIDONIE SQUIER, in her official capacity as Secretary of New Mexico Human Services Department; TED ROTH, in his official capacity as the Acting Director of the Income Support Division of the New Mexico Human Services Department; JULIE WEINBERG, in her capacity as the Acting Director of the Medical Assistance Division of the New Mexico Human Services Department; DOROTHY RODRIGUEZ, in her capacity as the Secretary of the New Mexico Taxation and Revenue Department; MICHAEL SANDOVAL, in his capacity as the Director of the Motor Vehicle Division of the New Mexico Taxation and Revenue Department,

    Defendants.

No. 11-2084

2

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 1:CIV-09-00668-JCH-DJS)**

Elaine P. Lujan, Assistant Attorney General (Gary K. King, New Mexico Attorney General, with her on the briefs), Albuquerque, New Mexico, for Defendant-Appellant, New Mexico Human Services Department.

Scott Fuqua, Assistant Attorney General (Gary K. King, New Mexico Attorney General, with him on the briefs), Santa Fe, New Mexico, for Defendant-Appellant, Dianna Duran.

Mark A. Posner, Lawyers Committee for Civil Rights Under Law, Washington, D.C., and Nicole K. Zeitler, Project Vote, Washington, D.C. (Cynthia A. Ricketts and Allison L. Kierman, DLA Piper LLP (US), Phoenix, AZ; Robert A. Kengle, Lawyers Committee for Civil Rights Under Law, Washington, D.C.; Niyati Shah, Project Vote, Washington, D.C.; Brenda Wright and Lisa J. Danetz, DEMOS: A Network of Ideas and Action, Brighton, Massachusetts; John W. Boyd and David Urias, Freedman Boyd Hollander Goldberg & Ives, P.A., Albuquerque, New Mexico, with them on the brief), for Plaintiffs-Appellees.

Thomas E. Perez, Assistant Attorney General; Diana K. Flynn and Jennifer Levin Eichhorn, Attorneys, Civil Rights Division, Appellate Section, United States Department of Justice, Washington, D.C., filed an amicus brief on behalf of the United States of America.

Before **BRISCOE,** Chief Judge, **GORSUCH** and **MATHESON**, Circuit Judges.

**BRISCOE**, Chief Judge.

These two companion appeals arise out of a lawsuit filed against New Mexico state officials seeking declaratory and injunctive relief to redress alleged violations of New Mexico's obligations under Sections 7 and 5 of the National

3

Voter Registration Act of 1993 (NVRA), 42 U.S.C. § 1973gg et seq. The Section 7 claim was resolved on summary judgment, with the district court concluding that the defendant officials responsible for overseeing New Mexico's Human Services Department (HSD) violated the NVRA by failing to provide voter registration forms to those applicants for public assistance who left the Section 7-mandated declination form blank. The Section 5 claim, which alleged that New Mexico's motor vehicle authority offices failed to provide necessary voter registration services, was resolved by written settlement agreement. Although two of the settling agencies reimbursed plaintiffs for a portion of the attorneys' fees and expenses plaintiffs incurred in litigating the Section 5 claim, the New Mexico Secretary of State refused to contribute. Plaintiffs subsequently sought and were granted attorneys' fees and expenses related to the Section 5 claim against the Secretary of State.

In Appeal No. 11-2063, defendants appeal from the district court's grant of summary judgment on the Section 7 claim. In Appeal No. 11-2084, the Secretary of State appeals from the district court's order granting plaintiffs' application for attorneys' fees and expenses arising out of the Section 5 claim. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the district court in all regards.

# I. Background

Generally speaking, Section 7 of the NVRA requires state public assistance offices to be designated as voter registration agencies and, in turn, to distribute with each application for public assistance a mail voter registration application form, unless the applicant, in writing, declines to register to vote.

It is undisputed that HSD qualifies as a state public assistance office under the NVRA. More specifically, HSD administers public assistance programs in New Mexico, including the Food Stamp Program, Temporary Assistance to Needy Families, and Medicaid. In accordance with the NVRA, the State of New Mexico "has designated HSD as a voter registration agency pursuant to the NVRA." Aplt. App. at 152.

HSD does not attach voter registration applications "to applications for public assistance, recertification or renewal applications, or change of address forms." Id. Nor does HSD automatically distribute voter registration applications to all applicants for HSD-related benefits. "Instead, HSD includes, as part of most of its benefit application forms, a section that it refers to as a 'declination provision.'" Id. The declination provision, which is typically included as a separately designated section in the middle of a multi-page benefits application form, provides as follows:

**If YOU are NOT registered to vote where you live now, would**

5

**you like to register to vote here today?** (Please check one) ☐ YES ☐ NO

**IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME.**

**The NATIONAL VOTER REGISTRATION ACT** provides you with the opportunity to register to vote at this location. If you would like help in filling out a voter registration application form, we will help you. The decision whether to seek or accept help is yours. You may fill out the application form in private. **IMPORTANT: Applying to register or declining to register to vote WILL NOT AFFECT the amount of assistance that you will be provided by this agency.**

Signature                                                        Date

**CONFIDENTIALITY:** Whether you decide to register to vote or not, your decision will remain confidential. **IF YOU BELIEVE THAT SOMEONE HAS INTERFERED with your right to register or to decline to register to vote, or your right to privacy in deciding whether to register or in applying to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with the Office of the Secretary of State, 419 State Capital, Santa Fe, NM, 87503, (phone: 1-800-477-3632.)**

Id. at 153 (emphasis in original).

Prior to this lawsuit, HSD's policy, which it believed was compliant with Section 7 of the NVRA, was to provide a benefits applicant with a voter registration application form only if he or she checked "YES" on the declination provision or verbally indicated that he or she would like to register to vote. As a result, HSD did not provide voter registration application forms to benefits applicants who left the declination provision blank and who did not otherwise

6

respond "yes" if a verbal inquiry regarding voter registration was made by an HSD employee.

On July 9, 2009, four New Mexico residents — including Roanna Begay — and the nonprofit organization Association of Community Organizations for Reform Now (ACORN) initiated this lawsuit by filing a complaint against six New Mexico state officials, four of whom were responsible for overseeing HSD (the remaining two officials were associated with New Mexico's Taxation and Revenue Department and its associated Motor Vehicle Division and are not part of Appeal No. 11-2063). The complaint, in pertinent part, sought declaratory and injunctive relief to redress ongoing violations of HSD's obligations under Section 7 of the NVRA.

Through subsequent pleadings, Shawna Allers became the sole plaintiff asserting the Section 7 claim. Plaintiffs were granted leave to file a first amended complaint substituting Allers for Roanna Begay as the individual plaintiff to bring the NVRA Section 7 against HSD. Then, the district court granted the parties' stipulated motion to dismiss ACORN from the case. The parties noted in their stipulation that "ACORN ha[d] closed its offices in New Mexico and no longer plan[ned] to provide voter registration assistance in the state," and thus was "not an appropriate Plaintiff in th[e] case." Id. at 28.

Allers moved for partial summary judgment against defendants on her claims that HSD had violated Section 7 of the NVRA. In that motion, Allers

asserted that "HSD's . . . policy regarding the distribution of voter registration applications [wa]s deficient because it fail[ed] to require HSD employees to distribute a voter registration application to all persons who appear[ed] at HSD offices to apply for public assistance benefits, recertify or renew their benefits, or submit a change of address, who d[id] not check either 'yes' or the 'no' box on HSD's voter information ('declination') form." Id. at 33.

The district court subsequently granted Allers' motion for partial summary judgment. The district court concluded that "Section 7 [of the NVRA] requires that [HSD's] clients be provided with a mail voter registration form unless they affirmatively decline, in writing." Id. at 161. In turn, the district court concluded that "HSD's . . . declination form and policy d[id] not meet this requirement." Id.

Following the grant of partial summary judgment, Allers and defendants filed a joint motion asking the district court to sign and enter their proposed consent order. The proposed consent order "establish[ed] specific procedures that HSD w[ould] follow for distributing voter registration applications, and for providing assistance to clients in completing these forms." Id. "The proposed order also require[d] that HSD employees who interact with public assistance clients receive voter registration training, that HSD and the Secretary of State collect and maintain voter registration data to track their implementation of the order, and that HSD and the Secretary of State undertake a variety of measures to monitor compliance with the terms of the order." Id. In addition, the proposed

8

consent order preserved defendants' right to appeal the district court's grant of Allers' motion for partial summary judgment.

The district court granted the joint motion and entered the proposed consent order. The defendants have filed a timely notice of appeal from the consent order.

*Appeal No. 11-2084*

The other three individual plaintiffs in the case — Cecilia Valdez, Graciela Grajeda, and Jessie Rodriguez — asserted claims under Section 5 of the NVRA against the officials responsible for overseeing New Mexico's Taxation and Revenue Department (TRD) and its associated Motor Vehicle Division (MVD). Section 5 of the NVRA provides, in pertinent part, that "[e]ach State motor vehicle driver's license application . . . submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration with respect to elections for Federal office . . . ." 42 U.S.C. § 1973gg-3(a)(1). The complaint in this case alleged that, "[d]espite the clear obligations under Section 5 of the NVRA, New Mexico's motor vehicle authority offices routinely fail[ed] to provide any voter registration services at all, much less the integrated application process required by law." Aplt. App. at 3.

On July 1, 2010, the parties entered into a written settlement agreement

9

resolving the Section 5 claims.[1]  The settlement agreement required the Office of

the Secretary of State, TRD, and local TRD and MVD offices to implement

certain staffing structures, including the Secretary of State's designation of a new

staff position called the "State NVRA Coordinator."  Id. at 80.  The settlement

agreement also contained a section entitled "ATTORNEYS' FEES AND

EXPENSES" that provided as follows:

> Plaintiffs shall be entitled to recover reasonable attorneys' fees and
> litigation expenses.  The parties shall confer in good faith to resolve
> the amount and payment of attorneys' fees and litigation expenses.
> If the parties are unable to reach agreement with respect to attorneys'
> fees for Plaintiffs' TRD claim within thirty days of the execution of
> this Agreement, the Plaintiffs shall submit their attorneys' fee
> application for that claim to Judge Herrera no later than forty-five
> days after execution of this Agreement.

Id. at 90.

The plaintiffs subsequently resolved their claims for attorneys' fees and

litigation expenses against TRD and MVD for a total of $200,000.  The Secretary

of State, however, refused to pay any portion of the requested fees and expenses.

Consequently, plaintiffs filed with the district court an application for attorneys'

fees and expenses from the Secretary of State.  The application sought to recover

$67,585.66 comprised of "the following: 1) the balance of the attorneys' fee

---

[1] The parties to the settlement agreement included the three individual plaintiffs and defendants Mary Herrera, the New Mexico Secretary of State, Rick Homans, the Secretary of TRD, and Michael Sandoval, the Director of MVD. New Mexico's current Secretary of State, Dianna Duran, was substituted as the named party after the settlement agreement was entered into.

10

lodestar regarding the Section 5 claim; 2) the time expended preparing the . . .

application; and 3) a pro rata share of travel time at 50 percent of the hourly

rates." Id. at 97. The application noted that "[t]he lodestar fees claimed" against

the Secretary of State "simply represent[ed] the difference between the total

Section 5 lodestar and the TRD/MVD settlement." Id. The application further

noted that although "the TRD/MVD settlement covered not only lodestar hours

but also expenses related to the Section 5 claim," plaintiffs "ha[d] elected to treat

the entire $200,000 TRD/MVD settlement amount as applying toward the

lodestar, [thereby] directly reducing the lodestar amount claimed against the

Secretary of State." Id. at 98 n.5. According to the application and supporting

documents, the fees and expenses incurred in preparing the application totaled

$23,115.

The Secretary of State opposed the application, arguing that plaintiffs

"ha[d] already [resolved] their fee request on th[e] [Section 5] claim and c[ould

not] meet the 'prevailing party' threshold necessary for such an award" against

the Secretary of State. Id. at 329. More specifically, the Secretary of State

argued that plaintiffs, "by segregating their fees by claim and not by defendant,"

and by accepting payment from TRD/MVD, "ha[d] settled their attorneys' fees

claim for all of their Section 5 work." Id. at 330. "Any other outcome," the

Secretary of State argued, "beg[ged] absurd results because it untether[ed] the fee

request from its bedrock basis - the lodestar." Id. at 332. Alternatively, the

11

Secretary of State argued that plaintiffs were not prevailing parties because "[p]laintiffs and the [Secretary of State] st[oo]d in precisely the same legal relationship to one another after entry of the settlement as before." Id. at 335. Moreover, the Secretary of State argued, she had done nothing to violate the NVRA. Id. at 335-36. Lastly, the Secretary of State argued that plaintiffs' application failed to substantiate, through a lodestar calculation, the amount they had requested. Id. at 336.

In their reply brief, plaintiffs asserted that the Secretary of State and the other two defendants had, under the terms of the settlement agreement, "agreed to pay Plaintiffs' reasonable attorneys' fees." Id. at 350. Plaintiffs in turn argued that, because the amount paid by TRD/MVD was "less than the lodestar amount owed to Plaintiffs," the Secretary of State "[wa]s liable to Plaintiffs for the unpaid amount." Id. As for the Secretary of State's assertion that plaintiffs had failed to establish that they were prevailing parties or that the Secretary of State had violated the NVRA, the plaintiffs noted that the Secretary of State had, under the terms of the settlement agreement, agreed that she was liable for fees and expenses, and that plaintiffs were thus relieved from having to establish anything further. Finally, plaintiffs argued, they "already ha[d] fully substantiated their lodestar calculation of the amount requested for attorneys' fees, both in their initial" application and the supporting exhibits thereto. Id. at 350-51.

The district court granted plaintiffs' application for attorneys' fees and

12

expenses. In doing so, the district court noted that "[p]laintiffs' attorneys expended a total of 910 hours litigating the Section 5 claim, not including travel time," all of which were "documented in declarations and meticulous, highly-detailed time records attached to their fee application." Id. at 380. The district court further noted that although plaintiffs' attorneys "almost exclusively practic[ed] out of state," they sought "fees based on local rates rather than their usual, much higher, customary rates." Id. The total lodestar calculation associated with the Section 5 claim, the district court noted, was $241,147.38, and "[t]he $41,174.38 that Plaintiffs s[ought] from the [Secretary of State] represent[ed] the difference between the total Section 5 lodestar and the TRD/MVD settlement." Id. at 381. Indeed, the court noted, plaintiffs' "methodology appear[ed] to result in a lower amount claimed against the [Secretary of State] than could validly be claimed" because the amount paid by TRD/MVD "covered not only lodestar hours, but also expenses, but Plaintiffs ha[d] elected to treat the entire $200,000 . . . amount as applying toward the lodestar amount, which directly reduce[d] the lodestar amount claimed against the [Secretary of State]." Id. n.4. As for the amount sought by plaintiffs for preparing the fee application, the district court concluded it was "not excessive," "given the complexity of the litigation involved, the number of attorneys from many different firms working together on the issues, and the thoroughness of the package that Plaintiffs submitted." Id.

13

The district court rejected each of the arguments urged by the Secretary of State in opposition to plaintiffs' application. To begin with, the district court characterized as "incorrect" the Secretary of State's assertion that plaintiffs, accepting payment from TRD/MVD, "gave up their rights to any further remuneration from the" Secretary of State. Id. at 382. Instead, the district court concluded, TRD/MVD's payment "only terminated TRD/MVD's obligations to pay attorneys' fees and costs," and left the Secretary of State's obligation intact. Id. at 383. Moreover, the district court concluded, "Plaintiffs were not made whole on their fee request when they accepted TRD/MVD's offer." Id. (internal quotation marks and citation omitted). The district court also concluded that "the amount sought by Plaintiffs [from the Secretary of State] [wa]s eminently reasonable," and far less than "the full lodestar amount that they ha[d] documented ($256,054.25) as well as documented litigation expenses ($32,615.24), reduced by the $200,000 payment from TRD/MVD." Id. at 384. In other words, the district court concluded, plaintiffs would have been justified in seeking from the Secretary of State an award "of $88,669.49, rather than the $41,174.38 that they s[ought]." Id.

The district court in turn rejected the Secretary of State's assertions that plaintiffs were not a "prevailing party" under the NVRA because they did not obtain an enforceable judgment on the merits, and that the settlement agreement could not confer prevailing party status on plaintiffs because it was not subject to

14

judicial approval. In doing so, the district court noted that the settlement agreement "specifically provide[d] that all Defendants [we]re liable to Plaintiffs for 'reasonable attorneys' fees and litigation expenses.'" Id. at 385. "This agreement," the district court noted, "d[id] not rely on a finding that Plaintiffs [we]re a 'prevailing party' for NVRA purposes to create liability for attorneys' fees and litigation costs; such liability [wa]s [instead] established on the face of the Settlement Agreement." Id. The district court further noted that, under Tenth Circuit precedent, "a court's decision on the merits [wa]s not required for a plaintiff to recover fees and costs as a prevailing party," and that in this case, "Plaintiffs' suit resulted in significant changes in how New Mexico implement[ed] Section 5 of the NVRA, and [plaintiffs thus] would rightfully be considered a prevailing party." Id. Relatedly, the district court rejected the Secretary of State's assertion that plaintiffs had failed to demonstrate that she violated the NVRA in any way. The district court noted that it "ha[d] explicitly rejected the [Secretary of State's] argument that, as the 'chief election official' for New Mexico, she d[id] not bear any responsibility for the state's failure to comply with the NVRA," and that, in any event, the settlement agreement did not "condition her liability [for fees and costs] on any offer of proof by Plaintiffs that she violated the NVRA." Id. at 386.

Lastly, the district court rejected the Secretary of State's assertion that the amount sought against her from plaintiffs was unjustified. The district court

15

emphasized that the settlement agreement "d[id] not subdivide or partition Plaintiffs' Section 5 claim, nor d[id] it subdivide the work performed in litigating and settling the claim for purposes of allocating fees," and instead "expressly provide[d] that both the [Secretary] and the TRD/MVD Defendants [we]re responsible for paying reasonable attorneys' fees to Plaintiffs." Id. at 386. "Had the [Secretary of State] intended to limit her liability for fees to those hours worked directly with respect to her counsel," the district court concluded, "she could have attempted to negotiate such a provision in the Settlement Agreement." Id. at 386-87. In any event, the district court concluded, "[t]he absence of a fee partition within the Settlement Agreement [wa]s reasonable, because Plaintiffs' Section 5 claim involve[d] a common core of facts that required Plaintiffs to obtain information from, and assess the conduct of, several Defendants, each of whom bore some responsibility for the alleged violations." Id. at 387. And, the district court concluded, even assuming, for purposes of argument, that "degree of success [wa]s relevant, Plaintiffs ha[d] demonstrated significant success against the [Secretary of State] as a result of their settlement." Id.

The Secretary of State appealed from the district court's order granting plaintiffs' application for fees and expenses.

## II. Analysis

*Appeal No. 11-2063*

In Appeal No. 11-2063, the HSD-related defendants challenge the district

16

court's grant of partial summary judgment in favor of plaintiff Allers on her claims under Section 7 of the NVRA. According to defendants, the district court misconstrued the provisions of Section 7. Alternatively, defendants assert that plaintiffs' counsel should be estopped from taking a position before the district court in this case that is inconsistent with the position they took before a federal district court in Indiana in a similar Section 7 case.

*a) Standard of review*

"We review summary judgment decisions de novo, applying the same legal standard as the district court." Tuckel v. Grover, 660 F.3d 1249, 1251 (10th Cir. 2011) (internal quotation marks omitted). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

*b) The district court's construction of Section 7*

Section 7 of the NVRA, 42 U.S.C. § 1973gg-5, is entitled "Voter registration agencies." As an initial matter, Section 7 generally requires "[e]ach State [to] designate agencies for the registration of voters in elections for Federal office," and in particular to "designate as voter registration agencies . . . all offices in the State that provide public assistance" or "State-funded programs primarily engaged in providing services to persons with disabilities." 42 U.S.C. § 1973gg-5(a)(1) & (a)(2). Section 7 in turn requires each designated voter registration agency to provide the following three services:

17

(i) Distribution of mail voter registration application forms . . . .
(ii) Assistance to applicants in completing voter registration application forms, unless the applicant refuses such assistance.
(iii) Acceptance of completed voter registration application forms for transmittal to the appropriate State election official.

42 U.S.C. § 1973gg-5(a)(4)(A).

If a designated voter registration agency "is an office that provides service or assistance in addition to conducting voter registration," Section 7 outlines in detail how that agency is to fulfill its three general duties. Specifically, Section 7 requires that agency to

> (A) distribute with each application for such service or assistance, and with each recertification, renewal, or change of address form relating to such service or assistance—
> > (I) the mail voter registration application form described in section 1973gg-7(a)(2) of this title . . . or
> > (ii) the office's own form if it is equivalent to the form described in section 19733gg-7(a)(2) of this title,
>
> unless the applicant, in writing, declines to register to vote;
>
> (B) provide a form that includes—
> > (I) the question, "If you are not registered to vote where you live now, would you like to apply to register to vote here today?";
> > (ii) if the agency provides public assistance, the statement, "Applying to register or declining to register to vote will not affect the amount of assistance that you will be provided by this agency.";
> > (iii) boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote (failure to check either box being deemed to constitute a declination to register for purposes of subparagraph (C)), together with the statement (in close proximity to the boxes and in prominent type), "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME.";

18

(iv) the statement, "If you would like help in filling out the voter registration application form, we will help you. The decision whether to seek or accept help is yours. You may fill out the application in private."; and

(v) the statement, "If you believe that someone has interfered with your right to register or to decline to register to vote, your right to privacy in deciding whether to register or in applying to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with _____.", the blank being filled by the name, address, and telephone number of the appropriate official to whom such a complaint should be addressed; and

(C) provide to each applicant who does not decline to register to vote the same degree of assistance with regard to the completion of the registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance.

42 U.S.C. § 1973gg-5(a)(6).

In this case, it is undisputed that HSD provides public assistance, has been designated by the State of New Mexico as a voter registration agency under Section 7, and is therefore subject to the obligations outlined above. It is further undisputed that HSD, in attempting to comply with those obligations, has adopted a policy and practice of providing voter registration forms only to those applicants who check the "YES" box on the declination form mandated by Section 7 (§ 1973gg-5(a)(6)(B)) or orally request a voter registration form. In other words, HSD has interpreted Section 7 as requiring an applicant to "opt in" to receiving a voter registration form, and, consequently, HSD does not provide voter registration forms to those applicants who check "NO" on the declination

19

form or leave the declination form blank (i.e., do not check either the "YES" or "NO" box on the declination form). At issue in this appeal is whether HSD's policy and practice of not providing voter registration forms to applicants who leave the declination form blank violates HSD's obligations under Section 7.

HSD's policy and practice appears to be based largely, if not exclusively, on the provisions of § 1973gg-5(a)(6)(B). Subsection (B), as noted above, outlines the information that must be included in the declination form given by HSD to its applicants for services and assistance. In pertinent part, it requires the declination form to include "boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote, . . . together with the statement (in close proximity to the boxes and prominent type), 'IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME.'" 42 U.S.C. § 1973gg-5(a)(6)(B)(iii). HSD argues that this capitalized written admonition to applicants means that if an applicant does not check either the "YES" or "NO" box on the declination form, the applicant must be deemed to have decided not to vote, and in turn HSD is relieved of its obligation to provide that applicant with a voter registration form.

HSD's position is directly rebutted by the language of § 1973gg-5(a)(6)(A). Subsection (A), as noted, requires a designated voter registration agency to provide an applicant with a voter registration form "unless the applicant, in

20

writing, declines to register to vote." Although neither subsection (A) nor any other subsection of the statute expressly defines the key phrase "in writing," it is commonly defined to mean "[t]he state or condition of having been written or penned; written form." Oxford English Dictionary, Online Edition, Sept. 2011, http://www.oed.com/view/Entry/230775?rskey=bbJo54&result=2&isAdvanced =false#eid14009491 (last visited January 25, 2012). Thus, subsection (A) must be interpreted as requiring a designated voter registration agency to provide an applicant with a voter registration form unless the applicant declines, in written form, to register to vote. As applied to the facts presented in this case, subsection (A) thus requires HSD to provide a benefits applicant with a voter registration form unless that applicant specifically checks the "NO" box on the declination form provided by HSD. In other words, an applicant's failure to check either the "YES" or "NO" box on the declination form does not constitute a declination "in writing." Thus, in sum, subsection (A) requires an applicant to affirmatively, by way of writing, "opt out" of receiving a voter registration form.

HSD argues, however, that the phrase "in writing," as employed in subsection (A), is "essentially define[d]" by subsection (B) to include either a check in the "NO" box on the declination form "or by leaving the [declination] form blank." Aplt. Br. at 11. The problem with HSD's argument is three-fold. First, HSD's proposed interpretation of the phrase "in writing" is clearly at odds with the ordinary meaning of that phrase, and there is no express indication by

21

Congress that it intended for the phrase, as used in Section 7, "to carry a specialized—and indeed, unusual—meaning." See Hamilton v. Lanning, 130 S. Ct. 2464, 2474 (2010). Consequently, there is no legitimate basis for us to adopt the definition suggested by HSD. Second, HSD's proposed interpretation of the phrase "in writing" renders superfluous the portion of the written admonition in subsection (B) that states, "AT THIS TIME." Although HSD's position is that an applicant's failure to check either the "YES" or "NO" box must be interpreted as a decision by the applicant not to register to vote at all, the phrase "AT THIS TIME" means that the failure must instead be interpreted simply as a decision by the applicant not to register to vote at that time, i.e., at the time they are present in one of HSD's offices seeking services or assistance. As plaintiffs suggest, it is conceivable that an applicant who chooses not to register to vote "at that time" might still be interested in receiving a mail voter registration form and completing it at another time and/or location. And third, Congress made clear, by way of the language contained in the first parenthetical in subsection (B)(iii), that an applicant's failure to check either box on the declination form must only be "deemed to constitute a declination to register for purposes of subparagraph (C)," i.e., it relieves the agency from its duty to provide the applicant with assistance in completing a voter registration form. Had Congress intended for an applicant's failure to check either box to also relieve the agency of its obligation under subsection (A) to provide a voter registration form, it presumably would have said

22

so.

At oral argument, HSD asserted for the first time that the interpretation adopted by the district court created tension between the provisions of subsections (B)(iii) and (B)(iv). From a jurisprudential standpoint, we are under no obligation to consider this argument. See, e.g., Corder v. Lewis Palmer Sch. Dist. No. 38, 566 F.3d 1219, 1235 n.8 (10th Cir. 2011) ("An argument made for the first time at oral argument . . . will not be considered."). And, in any event, we find no merit to it. Subsection (B)(iii) requires the declination form to advise an applicant of the effect of not checking either box on the form: they will be considered to have decided not to register to vote at that time. Subsection (B)(iv), in turn, requires the declination form to advise an applicant that if they "would like help in filling out the voter registration application form," the agency "will help" them. It also requires the declination form to advise the applicant that "[t]he decision whether to seek or accept help is [theirs]," and that they "may fill out the [voter registration] application in private." As we see it, the statements required by these two subsections effectively and harmoniously notify an applicant that their failure to check either box on the declination form will be considered a decision not to register to vote at that time, and thus not to seek help from the agency in completing the voter registration form.

We thus conclude, in sum, that when the provisions of § 1973gg-5(a)(6) are considered together, the most reasonable interpretation is the one urged by

23

plaintiff Allers and adopted by the district court.[2]  If an applicant is passive, i.e.,

does not check either the "YES" or "NO" box on the declination form and thereby

indicate his or her intent in writing, HSD must, in accordance with the mandate of

subsection (A), still provide him or her with a voter registration form, but is

relieved from providing the applicant with assistance in completing that form.[3]

On the other hand, if an applicant checks the "NO" box on the information form,

he or she would be deemed to have declined, in writing, the opportunity to receive

a voter registration form, and HSD would thus be relieved, under the language of

subsection (A), from providing the applicant with a voter registration form.

*c) Estoppel*

Defendants argue, in the alternative, that the district court's entry of partial

summary judgment in favor of plaintiff Allers should be reversed "on the grounds

that [plaintiff's] counsel can no longer maintain the position that HSD's policy is

outside the bounds of the NVRA."  Aplt. Br. at 8.  More specifically, defendants

argue that, "[i]n order to protect judicial integrity, [plaintiff's] counsel should be

estopped from continuing to argue before this Court that the policy at issue is

---

[2] We note that the Civil Rights Division of the United States Department of Justice filed an amicus brief agreeing with plaintiffs' interpretation.

[3] Subsection (C), as noted, requires a designated voter registration agency to "provide to each applicant who does not decline to register" assistance in completing the voter registration form.  The parenthetical language in subsection (B) must therefore be interpreted to mean that, when an applicant fails to check either box on the information form, the agency is relieved of its obligation to provide assistance to that applicant in completing a voter registration form.

illegal, when they have submitted the same policy to another federal court [in Indiana] for approval on the grounds that the policy is fair, reasonable, and adequate." Id.

We reject defendants' arguments. Generally speaking, the doctrine of judicial estoppel "applies when, among other things, a party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." Reed Elsevier, Inc. v. Muchnick, 130 S. Ct. 1237, 1249 (2010) (internal quotation marks omitted). Thus, "one of the elements of this doctrine is that the party against whom estoppel is asserted must have prevailed on the basis of his contradictory position in the prior proceeding." Webb v. ABF Freight Sys., Inc., 155 F.3d 1230, 1242 n.16 (10th Cir. 1998). Here, however, it is uncontroverted that plaintiff Allers was not a party to the Indiana case cited by defendants, and thus took no position in that case. Consequently, the doctrine simply does not apply in this case. To be sure, Allers' counsel in the instant case represented the plaintiff in the Indiana case, i.e., the Indiana State Conference of the NAACP. But, under controlling precedent, that fact simply has no relevance in determining whether the doctrine of judicial estoppel applies in this case. Judicial estoppel does not bind counsel, when representing a variety of parties, to always take the same position on a question.

25

Finally, it is not entirely clear that the position taken by the plaintiffs and their counsel in the Indiana case is inconsistent with the position taken by Allers in this case. Under the terms of the settlement agreement in the Indiana case, employees of the Indiana Family and Social Services Administration are required, when dealing with an applicant for services, to first offer the applicant a voter registration application and offer assistance to the client in completing that application. If the applicant does not want to register to vote, the employee then asks the applicant to complete a "notice/declination" form. Aplt. Br., Attachment E at 5. If the applicant declines to complete the notice/declination form, the employee notes on the form that the client declined to complete the form. Thus, arguably, the requirement of a declination "in writing" is always satisfied under these standards: either the applicant directly completes the notice/declination form, or the employee, having spoken with the applicant, effectively acts on his or her behalf to complete the form.

*Appeal No. 11-2084*

In Appeal No. 11-2084, the Secretary of State appeals from the district court's order granting plaintiffs' application for fees and expenses arising out of the litigation of their NVRA Section 5 claim. Generally speaking, "we review de novo the legal analysis providing the basis for the award . . . of attorney fees," and "review for abuse of discretion the amount of a fee or cost award." ClearOne Commc'ns, Inc. v. Bowers, 643 F.3d 735, 777 (10th Cir. 2011) (internal quotation

26

marks omitted). To the extent the issues raised on appeal by the Secretary implicate the construction of the parties' settlement agreement, we must apply state contract law in resolving those issues. Shoels v. Klebold, 375 F.3d 1054, 1060 (10th Cir. 2004).

*a) Plaintiffs' failure to segregate fees on a defendant-by-defendant basis*

The Secretary of State first argues that, "because [plaintiffs] did not segregate or seek fees on a defendant-by-defendant basis but instead chose to segregate and seek fees on a claim-by-claim basis, [plaintiffs resolved] their Section 5 fee claim in its entirety by accepting $200,000 from TRD in payment of those fees." Aplt. Br. at 5. We agree with district court, however, that this argument is incorrect.

It is undisputed that plaintiffs, the Secretary of State, TRD, and MVD entered into a written settlement agreement resolving plaintiffs' Section 5 claims. Under the terms of that settlement agreement, the parties agreed that plaintiffs were entitled to recover reasonable attorneys' fees and litigation expenses from all of the defendants. TRD and MVD subsequently agreed with plaintiffs to resolve their liability under the settlement agreement by paying plaintiffs. Because the Secretary of State had no involvement in the resolution between plaintiffs and TRD/MVD, the only arguable way that she could benefit from it would have been if the amount paid by TRD/MVD to plaintiffs was essentially equal to the total reasonable fees and expenses plaintiffs incurred in litigating

27

their Section 5 claim. But the record on appeal firmly establishes that this was not the case. As the district court noted, "[p]laintiffs' [fee] calculations resulted in a lodestar for the Section 5 claims of $256,054.25 at the New Mexico rate[s] ($564,542.10 at their customary rates), with litigation expenses of $32,615.24." Aplt. App. at 384. Thus, it was reasonable for the district court to hold the Secretary of State responsible for the difference between the lodestar amount claimed by plaintiffs and the amount paid to plaintiffs by TRD/MVD.[4]

As for the Secretary of State's complaint that plaintiffs failed to segregate their fee request by defendant, rather than by claim, the district court aptly noted that, "[h]ad the [Secretary of State] intended to limit her liability for fees to those hours worked directly with respect to her counsel, she could have attempted to negotiate such a provision in the Settlement Agreement." Id. at 386-87. Because she failed to do so, the settlement agreement cannot reasonably be interpreted as requiring plaintiffs to segregate their fee request by defendant.

*b) Inadequate lodestar justification for award*

In her second issue on appeal, the Secretary of State argues that, "because [plaintiffs] did not segregate their fees on a defendant-by-defendant basis,

---

[4] Although the Secretary of State raises concerns about what would have happened had TRD/MVD paid plaintiffs a much lower figure, leaving her to pay the bulk of plaintiffs' fees and expenses, that is a hypothetical situation that is not before us. Under the actual facts presented in this case, the Secretary of State benefitted substantially from the payment made by TRD/MVD.

28

[plaintiffs] failed to provide an adequate lodestar justification for the $41,174.38 they sought from [the Secretary]." Aplt. Br. at 5. As discussed above, however, nothing in the parties' settlement agreement required plaintiffs to segregate their fees on this basis. The district court concluded, and the Secretary of State does not dispute, that "[t]he absence of [such] a fee partition within the Settlement Agreement [wa]s reasonable[] because Plaintiffs' Section 5 claim involve[d] a common core of facts that required Plaintiffs to obtain information from, and assess the conduct of, several Defendants, each of whom bore some responsibility for the alleged violations." Aplt. App. at 387. Moreover, the district court noted that the Secretary of State "d[id] not appear to challenge the reasonableness of the number of hours Plaintiffs' counsel worked to litigate and settle the Section 5 claim," and the Secretary of State does not dispute this point on appeal. Relatedly, the district court expressly found that plaintiffs utilized "a valid method of allocating hours among claims, and . . . ha[d] substantiated such hours through clear documentation." Id. Thus, in short, the Secretary of State's "inadequate lodestar justification" argument is not justified by the terms of the parties' settlement agreement, nor does it find any factual support in the record on appeal.

c) *Whether plaintiffs were a "prevailing party"*

In her third issue on appeal, the Secretary of State argues that "the District Court erred in determining that [plaintiffs] were a 'prevailing party' for attorneys'

fees purposes because the settlement agreement [wa]s not sufficiently similar to a consent decree." Aplt. Br. at 6. Citing Supreme Court and Tenth Circuit case law, the Secretary of State argues that a settlement does not confer prevailing party status on a plaintiff unless the district court overseeing the case (1) incorporates the settlement into an order, (2) signs or otherwise provides written approval of the settlement's terms, or (3) retains jurisdiction to enforce performance of the obligations assumed by the parties. In turn, the Secretary of State argues that because none of those factors were present in this case, the plaintiffs cannot be considered prevailing parties and thus were not entitled to an award of fees and expenses.

We reject the Secretary of State's arguments. At no time did the district court deem plaintiffs "prevailing parties" in this litigation. Indeed, the district court concluded it was unnecessary for plaintiffs to establish their status as prevailing parties because the Secretary and the other two defendants had expressly agreed, under the terms of the written settlement agreement, to pay plaintiffs their reasonable attorneys' fees and expenses associated with litigating their Section 5 claims. In light of the Secretary of State's agreement in this regard, which amounted to a private contractual matter, there was no need for plaintiffs to satisfy the typical requirements for obtaining fees and expenses. Notably, the Secretary of State has failed to cite to a single case holding otherwise.

30

*d) Fees for preparation of fee application*

In her fourth and final issue on appeal, the Secretary of State contends that "the District Court erred by awarding $23,115 in connection with [plaintiffs'] preparation of their fee [application]." Aplt. Br. at 6. "Not only [wa]s that amount a disproportionate percentage of the total fee award," the Secretary of State argues, "but it [wa]s unjustifiable in light of the fact that [plaintiffs] did not submit a fee petition reasonably confined to work performed against [the Secretary of State]." Id.

In opposing the plaintiffs' fee application in the district court, the Secretary of State argued that plaintiffs were not entitled to any fees in connection with the preparation of their fee application. But the Secretary of State's basis for this argument was that plaintiffs had otherwise failed to establish their entitlement to fees in connection with their Section 5 claims. The Secretary of State did not argue, as she does now, that the fees associated with the application were "a disproportionate percentage of the total fee award." Thus, the district court did not address this argument.

The general rule in this circuit is that, "[a]bsent extraordinary circumstances, we will not consider arguments raised for the first time on appeal." Koch v. City of Del City, 660 F.3d 1228, 1237 n.4 (10th Cir. 2011) (internal quotation marks omitted). Because the Secretary of State "points us to no extraordinary circumstances warranting consideration of this newly asserted

31

claim on appeal," it is unnecessary for us to consider it.

III.

In Appeal No. 11-2063, we AFFIRM the district court's grant of partial summary judgment in favor of plaintiff Allers. In Appeal No. 11-2084, we AFFIRM the district court's grant of plaintiffs' application for fees and expenses from the New Mexico Secretary of State.